**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

Wickersham Construction and     *
Engineering, Inc.     *
    *
      v.     *       Civil Action No. CCB-16-4087
    *
The Town of Sudlersville, Maryland     *

**<u>MEMORANDUM</u>**

      This is a breach of contract action brought by Wickersham Construction and Engineering,

Inc. ("Wickersham") against the Town of Sudlersville, Maryland ("Sudlersville").  The court

held a four-day bench trial beginning January 27, 2020.  What follows constitutes the court's

findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.  For the reasons stated

below, the court finds that Sudlersville materially breached the contract by paying Wickersham

late, and caused some of the delays for which an equitable adjustment of the contract price is

warranted.  The court will award damages to Wickersham in the amount of $402,000.22.

## I.     BACKGROUND

      This case arises from a construction project to upgrade a wastewater treatment plant in

Sudlersville, Maryland.  Sudlersville is a small town in the eastern part of Maryland, with a

population of about 415.  (Testimony of Jo Manning).  Sometime in 2012, the state of Maryland

required that Sudlersville upgrade its wastewater processing, which involved building a new

wastewater treatment plant.  (Testimony of Manning and Ronald Ford).  As Sudlersville did not

have the money to do this, it obtained a loan and grant from the U.S. Department of Agriculture

and grants from the Maryland Department of Energy ("MDE").  (Testimony of Manning).  The

town's engineer, KCI Technologies, Inc. ("KCI"), designed the new treatment plant.  Dan String

of KCI was the project designer, Peter Bourne was the liaison between the town and KCI, and,

after construction started, Jessie Downey was the inspector for the project.  (*Id.*).

Sudlersville employed a part-time town manager, Jo Manning, who helped to administer the project on behalf of the town.  She procured funding for the project, obtained permits, and was involved in the bidding process.  (*Id.*).  KCI also played a large role in contract administration and in the bidding process.  (Testimony of Dan String).  The bid was eventually awarded to Wickersham Constructing and Engineering, a general contractor located in Pennsylvania.  (Testimony of Manning).

Sudlersville and Wickersham entered into the contract on July 18, 2014.  The contract consisted of the Form of Agreement (Joint Exhibit ("J.X.") 1), the Standard General Conditions of the Construction Contract (J.X. 2), and the Supplementary Conditions (J.X. 3).  The total contract price was $6,204,000.  (Plaintiff's Exhibit ("P.X.") 102, Change Order No. 4 showing original contract price).  The supplementary conditions specified that the project was financed in whole or in part by the USDA Rural Utilities Service, and the Agency for the contract was USDA Rural Development ("USDA").  (Supplementary Condition 1.01.A.2).  KCI, the engineer, was the town's representative under the contract.  (General Condition 9.01).  KCI was responsible for initially approving Wickersham's payment applications, and for monitoring Wickersham's work on site.  KCI was also, under the contract, the first point of contact for dispute resolution and contract interpretation, and performed some contract administration duties, such as leading project meetings.  (Testimony of String).  The parties to the contract were Sudlersville (as the owner) and Wickersham (as the contractor); neither USDA, MDE, nor KCI were parties.  (*See* Form of Agreement at 6, Signature Page).

The contract provided for progress payments to Wickersham.  First, applications for payments were submitted to the engineer.  (General Condition 14.02.A.1).  The engineer would, within ten days, either recommend payment and present the application to Sudlersville, or refuse to recommend payment and indicate the reasons why.  (General Condition 14.02.B.1).

Sudlersville then sent the payment applications to the agency (USDA) for approval, which was required for payment. (Supplementary Conditions 1.01.A.3, 14.02.A.4 ("The Agency must approve all Applications for Payment before payment is made")).  The contract provided that:

> The Application for Payment with Engineer's recommendations will be presented to the Owner and Agency for consideration. If both the Owner and Agency find the Application for Payment acceptable, the recommended amount less any reductions under the provisions of Paragraph 14.02.D will become due ten days after the Application for Payment is presented to the Owner, and the Owner will make payment to the Contractor.

(Supplementary Condition 14.02.C.1).

The notes of the July 18, 2014, preconstruction meeting indicate, however, that Wickersham was informed that payment could be expected thirty days after the pay application was submitted.  (Defense Exhibit ("D.X.") 43, at PC-20).  This is different from the terms of the contract, which appear to provide a maximum of twenty days for payment if the engineer, Sudlersville, and USDA approve: ten days for KCI to approve and present to Sudlersville (General Condition 14.02.B.1), and ten days for Sudlersville to pay (Supplementary Condition 14.02.C.1).

The contract unfortunately did not state what would happen if USDA did not approve the application for payment within ten days after the application was presented to the owner, and did not mention MDE's role at all.  Additionally, the process by which Sudlersville received the funds was not conducive to meeting the twenty-day deadline.  Manning testified that obtaining the release of funds from the agencies was a cumbersome process: she would send the pay request for MDE to approve, then create a USDA pay request and three MDE pay requests (for the three MDE grants), get MDE to sign the documents, and then get USDA to sign the documents.  (Testimony of Manning).  According to Manning, MDE generally took significantly longer than USDA to release funds, with USDA typically taking ten days, and MDE typically

taking thirty to forty-five days.  (*Id.*).  Further, USDA did not know how much it had to pay as to each application (even if it had already approved the application) until MDE had also approved the application and stated how much it would pay.  (*Id.*).  At one point, Sudlersville attempted to obtain additional funding for an interim loan to bridge the gap in agency funding, but was only able to obtain a $550,000 loan, with the ability to redraw up to $850,000.  (*Id.*).

KCI was responsible for answering requests for information ("RFI").  An RFI might reveal missing design elements, in which case Wickersham would submit a pricing change order ("PCO"), which would allow Wickersham to do additional necessary work that was not included in the original design, and to be paid for that work.  (Testimony of Brad Smith).  A PCO, if approved by the engineer, became a change order.  A change order officially modified the contract, to give the contractor extra pay and/or extra time in accordance with the new work that must be completed.  (*Id.*).

A.  August 2014–September 2015

Wickersham was issued a Notice to Proceed with a start date of August 4, 2014.  (D.X. 43, Pre-Construction Meeting Minutes, at PC-5).  The Notice to Proceed provided a substantial completion date for the wastewater treatment project of July 30, 2015, and a final completion date of August 29, 2015.  (*Id.*; P.X. 97, Versaw's Report of Findings ("Expert Report") at 7).[1] Although there were delays, including some due to weather, it appears the first major change did not come until June 2015, when the parties executed Change Order 4.  (Expert Report at 22). Change Order 4 changed the design of the influent pump station, which cost an additional $86,740,[2] and added eighteen days to the substantial completion date and 133 days to the final

---

[1] Versaw's report states that the substantial completion date was July 29, 2015, but the time to substantial completion (360 days) from the start date in the Notice to Proceed (August 4, 2014), appears to be July 30, 2015.
[2] The prior change orders had reduced the contract price by $24,317.00.  (P.X. 102, Change Order No. 4).

payment date.[3]  (P.X. 102, Change Order No. 4).  The influent pump station is located away from the main treatment plant and did not affect work on the main plant, but the change order extended the timeline of the overall project (until final completion).  (Testimony of String).

Problems began to arise in July and August of 2015.  Particularly, starting in August of 2015, Wickersham filed several RFIs and PCOs that it claims were not timely responded to by KCI.  In August 2015, Wickersham issued seven RFIs related to missing electrical/controls designs, and then issued seven RFIs in September 2015 for power/controls designs.  (Expert Report at 25–27).  The court credits Wickersham CEO Brad Smith's testimony that some RFIs, as well as PCOs, were not responded to in a timely manner.  For example, Smith described during trial a change order request from around July 2015 regarding an air line that was critical, and which was not resolved until the beginning of the next year.  (Testimony of Smith).  Smith also testified that not getting timely answers to RFIs and PCOs affected Wickersham's progress, because it would either have to wait to complete certain work, follow the original design, or try to predict how KCI would respond to the request.  (*Id.*).  The court also, however, credits String's testimony that some of these requests were for information that was already contained in the project documents, should have been coordinated directly with subcontractors, or should have been requested earlier, as by August 2015, when Wickersham made these requests, substantial completion was supposed to be only a few weeks away.  (Testimony of String).[4]

---

[3] The change order provides the contract time until "ready for final payment."  It is not clear if this is the same as final completion date.

[4] There was also an issue regarding a stormwater permit.  Smith testified that Sudlersville failed to obtain a stormwater permit that was needed to complete construction of a basin in August 2015, and Wickersham did not get enough guidance to complete this project until a year later.  (Testimony of Smith).  String testified that he did not believe the stormwater permit was necessary to the critical path of construction and that the lack of the permit was not what caused the delay, as there was other work that could have been done.  (Testimony of String).

B.  Untimely Payments and Suspension (September 2015–March 2016)

Around the same time that Wickersham submitted an influx of RFIs and PCOs (to which it appears KCI did not timely respond) the issues regarding Sudlersville's late payments also came to a head.  Prior to the summer of 2015, it appears pay applications 1–8 were late under the terms of the contract, but no evidence was presented that Wickersham took any action.  Pay application 9 was approved by the engineer on July 14, 2015, and by Sudlersville on July 15, but was not paid until October 1, 2015.  (P.X. 59, 88).  Pay application 10 was approved by the engineer and owner on August 3, 2015, and payment was made in parts on October 1, 8, and 9.  (P.X. 61, 89).  Pay application 11 was approved by the engineer and owner on September 14, 2015, and payment was made in part on October 9 and completed on November 6, 2015.  (P.X. 63, 90).

General Condition 15.04.B provides that "if Engineer has failed to act on an Application for Payment within 30 days after it is submitted, or Owner has failed for 30 days to pay Contractor any sum finally determined to be due, Contractor may, seven days after written notice to Owner and Engineer, stop the Work until payment is made of all such amounts due Contractor, including interest thereon."  No work may otherwise be delayed because of disagreements or disputes except as provided in General Condition 15.04 or otherwise agreed in writing.  (General Condition 6.18.A).

On September 9, 2015, Wickersham claimed that pay applications 9 and 10 were more than thirty days past due, and gave notice of its intent to suspend work under General Condition 15.04.B.  (P.X. 5, Sept. 9, 2015, Letter from Brad Smith).  On September 22, 2015, Wickersham provided formal notice it was suspending work.  (P.X. 6, September 22, 2015, Suspension Letter).  As noted above, the pay applications (including application 11, which became due

during the suspension) were eventually paid in September, October, and November of 2015.  The

following chart illustrates the timing of the pay applications and payments:

| Pay application number | Invoice Date[5] | Amount Due | Engineer Approval | Owner Approval | Agency (USDA) Approval | Due Date[6] | Date Paid |
|---|---|---|---|---|---|---|---|
| 9 (P.X. 59, 60, 88) | 07/6/15 | $521,585.08 | 7/14/15 | 7/15/15 | 9/8/15 | 7/24/15 | 10/1/15[7] |
| 10 (P.X. 61, 62, 89) | 08/3/15 | $665,801.20 | 8/3/15 | 8/3/15 | 9/8/15 | 8/13/15 | 10/1/15 ($327,590.89, P.X. 62, WICK 029025)<br><br>10/8/15 ($126,605.00)<br><br>10/9/15 ($211,605.31, P.X. 63, WICK 029501) |
| 11 (P.X. 63, 64, 90) | 09/2/15 | $418,488.21 | 9/14/15 | 9/14/15 | 9/16/15 | 9/22/15 (max 20 days) | 10/9/15 ($6,303.69, P.X. 63, WICK 029501)<br><br>11/6/15 ($412,184.52) |

The parties disagreed on whether interest was owed on these pay applications, with

Wickersham stating it was entitled to interest.  (Testimony of Berg).  Wickersham also

conditioned returning to work on KCI processing its RFIs and PCOs.  (J.X. 5).  Because of the

interest and RFI/PCO disputes, Wickersham did not return to work until March 2016.

---

[5] The invoice dates provided in Wickersham's chart calculating interest (P.X. 41) are at times a few days later than the dates appearing on the invoices that Wickersham has attached as exhibits. In these instances, the court will use Wickersham's later dates.

[6] The court's findings here differ from Wickersham's calculated due dates (*see* P.X. 41) because Wickersham calculated the due dates based on the date it believed KCI should have signed at the job construction meetings, (*see* Testimony of Bruce Berg), while the court calculates the due date based on the date KCI and Sudlersville actually signed, or the maximum of twenty days after the application was sent to KCI.

[7] Wickersham's exhibits include checks with dates different from the dates Wickersham noted the invoices were paid.  This is likely because, in order to obtain funding, Manning had to send a copy of the check first to MDE in order for it to approve the amount, and then send a copy of that check after approval to Wickersham for the actual payment.  (Testimony of Manning).

C.  Post Suspension

On March 2, 2016, Wickersham prepared to remobilize and started work again on March

7, 2016.  (P.X. 97, Expert Report at 31).  From April 2016 to August 2016, there were additional

delays.  (*Id.* at 31–36).  From the court's perspective based on the testimony at trial, the

relationship between Wickersham and Sudlersville/KCI deteriorated, with both sides frustrated

and believing they were being treated unjustly by the other.

There were also continued late payments.  The following chart shows the court's findings

as to pay applications 12–18:

| Pay Application Number | Invoice Date | Amount Due | Engineer Approval | Owner Approval | Agency Approval | Due Date | Date Paid |
|---|---|---|---|---|---|---|---|
| 12 (P.X. 65, 66, 91) | 10/02/15 | $226,834.12 | 10/5/15 | 10/5/15 | 10/19/15 | 10/15/15 | 11/6/15 |
| 13 (P.X. 67, 68, 92) | 11/2/15 | $15,934.11 | 12/22/15 | 12/22/15 | 12/22/15 | 11/22/15 (max 20 days) | 11/6/15 ($6,303.69, P.X. 67, WICK 029536, 029561)  12/31/15 ($15,934.11, P.X. 68, WICK 029061)[8] |
| 14 (P.X. 69, 70, 93) | 4/4/16 | $204,410.55 | 4/14/16 | 4/19/16 | 4/26/16 | 4/24/15 (max 20 days) | 5/6/16[9] |
| 15 (P.X. 71, 72, 94) | 4/29/16 | $167,478.35 | 5/13/16 | 5/23/16 | 5/26/16 | 5/19/15 (max 20 days) | 7/1/16[10] |
| 16 (P.X. 73, 74, 95) | 6/6/16 (handwritten change of date, P.X. | $7,932.50 | 6/7/16 | 6/7/16 | 6/16/16 | 6/17/16 | 7/1/16 |

[8] The records indicate that Wickersham may have been overpaid by $6,303.69 for pay application 13.  At trial, Berg testified that he informed Manning of this, and never received a reduction on payment, so Berg applied that money to future payments and reduced the amount of interest being calculated. (Testimony of Berg).

[9] Although the invoice was stamped as paid on May 9 (P.X. 70, WICK 029063), an email from Moffett to Smith indicates that the check was received on May 6 (P.X. 69, WICK 029590).

[10] The record contains a June 29, 2016, letter from Manning stating that payments for Pay Requests 15, 16, and 17 were enclosed, (P.X. 73, WICK 029625), but Wickersham's records indicate it was paid for these applications on July 1, 2016.  Because it is not clear when Wickersham received the June 29 letter, the court will assume it was received on July 1.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 95, USDA 000 754) | | | | | | |
| 17 (P.X. 75, 76, 96) | 6/6/16 (handwritten change of date, P.X. 96, USDA 000 747) | $157,501.65 | 6/7/16 | 6/7/16 | 6/16/16 | 6/17/16 | 7/1/16 |
| 18 (P.X. 77) | 7/7/16 | $75,071.65 | | | | 7/27/16[11] | 12/12/16 |

Although the exact timeline is not clear, Wickersham alleges that Sudlersville and KCI interfered with its relationships with its subcontractors by communicating directly with the subcontractors. For example, Smith recalled one instance in which a subcontractor complained to KCI that it had not been paid, and KCI had (allegedly erroneously) told the subcontractor that Wickersham had been paid. (Testimony of Smith). According to Smith, this caused distrust between Wickersham and the subcontractors. (*Id.*). The court credits Manning's testimony, however, that she would talk with subcontractors who approached her, but never initiated any conversations. (Testimony of Manning).

At least as of November 3, 2016, substantial completion had been achieved. (J.X. 9, November 3, 2016, letter). Towards the end of a project, a "punchlist" is created, in which the outstanding items that still need to be completed are memorialized. (Testimony of Smith). A list of outstanding items was generated after the final completion acceptance inspection was performed on September 7, 2016, (J.X. 9), and another punchlist was generated on July 18, 2017 (J.X. 22). While some of the items may have been resolved by the time of the July 18, 2017, letter, a number of items remained. There were apparently many disputes as to who was responsible for these outstanding items, as well as the cost of the items. As of the time pay application 19 was being reviewed, in August 2016 (*see* P.X. 134), String estimated that the

---

[11] As the signed copies of pay application 18 do not appear to be in the record, the court will assume the deadline is July 27, which would be the maximum 20 days under the contract.

outstanding items would cost over $25,000.  (*See* Testimony of String, requiring $50,000 of retainage on pay application 19, because the value of outstanding work, multiplied by 200 percent, exceeded $50,000).  Smith, however, estimated that the punchlist items identified in that correspondence (J.X. 22) would cost only $1,000.  (Testimony of Smith).

The warranties also proved problematic.  In regard to the warranties, there are equipment warranties, which are warranties directly to the town, and contractor's workmanship warranties, which are promises by the contractor to finish items at a later time.  (Testimony of String). Wickersham has not delivered the warranties to Sudlersville needed to close out the contract. (*Id.*).  The issue involves when the warranties would start to run, and whether the warranties had run out due to the delay in completing the project, particularly the suspension period. (Testimony of Smith).  The record is not clear, however, as to the value of any outstanding warranties.

As discussed above, Wickersham and KCI had significantly different estimates as to the cost of the outstanding work.  The cost of the outstanding work is important in determining retainage, which is a portion of the contract price that is withheld by the owner (here, Sudlersville) in order to ensure that the contractor complies with its obligations.  Therefore, for each progress payment due to Wickersham, Sudlersville withheld certain amounts as retainage. The reason pay applications 19 and 20 could not be approved, according to String, was the existence of a disagreement about the amount of retainage Sudlersville was entitled to keep. (Testimony of String).  KCI recommended the town hold $50,000 of retainage, which it did. (*Id.*).  According to Dan String, the value of unfinished work, multiplied by 200 percent (which is the process for calculating retainage), exceeded $50,000, but KCI felt that holding back just $50,000 was a reasonable approach and would encourage Wickersham to complete the project. (*Id.*).

10

It appears that application 19 was eventually approved by KCI on August 19, 2016, after Wickersham agreed to reduce its request for retainage, (P.X. 133–35), but it is not clear what happened to the application after that agreement, as it was never approved by Sudlersville, and Wickersham was never paid.  Application 19 was for $68,031.  (P.X. 78).  Wickersham also submitted pay application 20, for $1,352 plus $45,000 in retainage, (P.X. 41, Wickersham's Interest Chart), but it does not appear that there was any response from KCI.  According to String, application 20 requested Sudlersville pay out most of the retainage, which he did not agree was warranted.  (Testimony of String).  Manning testified that she has never seen pay applications 19 and 20.  (Testimony of Manning).  Because Wickersham was not getting paid the amount it believed it was owed, and because there appeared to be no progress in negotiations, Wickersham terminated the contract on September 19, 2017.  (J.X. 12).  Because of the disputes over interest, retainage, and damages, Wickersham also never submitted its final pay application. (Testimony of Berg).

The town has had continued difficulties with the plant.  The plant is operating but not in compliance with Maryland's requirements, which according to Manning is because of both the construction of the plant and the operation of the plant (which is the responsibility of another company, not Wickersham).  (Testimony of Manning).  Manning also testified that the town has spent approximately $132,000 repairing work completed by Wickersham that was allegedly faulty.  (*Id.*).

## II.    ANALYSIS

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation."

11

*Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001).[12]  There is no dispute here that

Wickersham and Sudlersville entered into a contract to construct the wastewater treatment plant.

(J.X. 1, 2, 3).

"Maryland applies an objective interpretation of contracts." *Nova Research, Inc. v.*

*Penske Truck Leasing Co.*, 405 Md. 435, 448 (2008).  "If a contract is unambiguous, the court

must give effect to its plain meaning and not contemplate what the parties may have subjectively

intended by certain terms at the time of formation." *Id.*  A contract provision is interpreted in

light of the entire agreement. *Id.*  The "primary consideration, when interpreting a contract's

terms, is the 'customary, ordinary, and accepted meaning' of the language used." *Atl.*

*Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 301 (2004) (citation omitted).

    A.  Late Payments

Sudlersville argues that the evidence shows the payment provisions were modified so that

strict compliance was not required.  It points to Wickersham's continuous acceptance of late

payments; Wickersham's understanding that Sudlersville was reliant on agency funding,

including from MDE; and representations at a pre-construction meeting that payment could be

expected thirty days after Wickersham submitted an approved pay application.

First, the court finds that under the contract an approved payment was due a maximum of

twenty days after the application was presented to the engineer, or a maximum of ten days after

the application was presented to the owner.  It is clear under the contract that the engineer has ten

days to recommend payment and present the application to the owner, or to refuse payment.

(General Condition 14.02.B.1).  If the owner and USDA approved payment, it was then due ten

days after the application was presented to the owner.  (Supplementary Condition 14.02.C.1).

---

[12] The contract provides that it is to be governed by the law of the state in which the project is located, (General Condition 17.05), which is Maryland.

The court notes that, although there was some initial confusion, representatives of the town and KCI eventually agreed that payment became due ten days after the pay application was presented to Sudlersville.  In a December 18, 2015, letter from Manning to Smith, she stated that "payment [to Wickersham] become[s] due 30 days from the date of receipt of the approved application by the Owner."  (J.X. 7).  That letter, however, cites to General Condition 14.07, which regards final payment and not progress payments, and Peter Bourne and Jo Manning both acknowledged in a subsequent email with each other that payment was due ten days after KCI approves and presents the pay application to Sudlersville.  (P.X. 9 (Feb. 24 email between Manning and Bourne); Testimony of Manning).  Additionally, in a September 6, 2017, letter to Shore United Bank regarding Sudlersville's line of credit, Manning noted that "[t]he contract states that invoices must be paid within 10 days of approval which was the purpose of the line of credit[.]"  (P.X. 17).

It appears that most if not all payments were paid either more than twenty days after the payment application was presented to KCI, or more than ten days after the payment application was presented to and approved by Sudlersville.  These payments were late under the contract.[13]

---

[13] Though it did not press this argument in its post-trial brief, at trial Sudlersville argued that USDA approval was a condition precedent to payment, and therefore payment could not be due until USDA approved the pay application. The court disagrees.  A condition precedent is a "fact . . . which, unless excused, must exist or occur before a duty of immediate performance of a promise arises."  *Chirichella v. Erwin*, 270 Md. 178, 182 (1973).  "The question whether a stipulation in a contract constitutes a condition precedent is one of construction, dependent on the intent of the parties to be gathered from the words they have employed."  *Id.* at 182.  "Although no particular form of words is necessary in order to create an express condition, such words and phrases as 'if' and 'provided that' are commonly used to indicate that performance has been made expressly conditional."  *Id.*  And "[w]here the language in the contract is doubtful, we will interpret the 'language as embodying a promise or constructive condition rather than express condition.'"  *Richard F. Kline*, 165 Md. App. 262, 274 (2005) (citation omitted).  In this case, the contract drafters included express language creating conditions precedent in some parts of the contract.  *See, e.g.* General Condition 10.05A ("A decision by Engineer shall be required as a condition precedent to any exercise . . . of any rights or remedies."); General Condition 5.06A ("Owner shall purchase . . . property insurance . . . cover[ing] materials and equipment stored at the Site . . . provided that such materials and equipment have been included in an Application for Payment"; General Condition 6.20A ("Contractor shall indemnify . . . Owner and Engineer . . . against all claims . . . arising out of . . . performance of the Work, provided that any such claim . . . is attributable to bodily injury, [etc.]").  But as to USDA approval, the contract states only that "The Agency must approve all Applications for Payment before payment is made."  (Special Condition 14.02.A.4).  Notably, the contract does not say USDA must approve before payment is *due* or *owed*, but only that it must approve before it is *made*; nor does it

The court finds, however, that Wickersham waived the payment deadlines as to the first eight payments because it accepted them late without sufficient objection.  "Parties to a contract may waive the requirements of the contract by subsequent oral agreement or conduct, notwithstanding any provision in the contract that modifications must be in writing."  *Kline*, 165 Md. App. at 277.  "If a provision in the contract requires modifications to be in writing, it must be shown, either by express agreement or by implication, that the parties understood that provision was to be waived."  *Id.* at 277–78.  "Subsequent oral modification of a written agreement may be established by a preponderance of the evidence."  *Id.* at 278.[14]

In *Deyesu v. Donhauser*, 156 Md. App. 124 (2004), the Deyesus argued that the builder, Wizard Knolls, breached the contract by failing to finish its work by the contract expiration date of April 30, 2000.  *Id.* at 135.  Evidence indicated, however, that the Deyesus accepted work done on their home after that date without any objection.  *Id.* at 135–36.  Therefore, they waived any breach.  *Id.* at 135–36.  Similarly, Wickersham accepted the first eight payments late without any claim for interest.  Although a June 11, 2015, letter in the record from Brad Smith to KCI discusses "ongoing payment delays," (J.X. 13), there is nothing in the record showing that Wickersham refused to accept the payments, made a claim for interest, or even mentioned interest.  Therefore, the court finds that as to the first eight payments, Wickersham waived any breach.

---

employ the express language used by the drafters elsewhere in the contract to create an express condition, such as "provided that" or "condition precedent."

[14] Article 9 of the Form of Agreement states that "[t]he Contract Documents may only be amended, modified, or supplemented as provided in Paragraph 3.04 of the General Conditions."  (Form of Agreement, 9.01.C).  General Condition 3.04 provides for amendments of the Contract Documents by change order or work change directive, and for supplementation of the Contract Documents by field order, engineer's approval, or engineer's written interpretation or clarification.  (General Condition 3.04).

Wickersham's acceptance of the first eight payments without sufficient objection and without a demand for interest does not show, however, that Wickersham waived the payment deadlines as a whole. This case is distinguishable from *Kline,* 165 Md. App. 262, to which Sudlersville cites. In *Kline*, in a suit between a contractor and subcontractor, the court found sufficient evidence to support modification of a provision that the subcontractor would work under the direction of the architect, engineer, or owner. 165 Md. App. at 279. There, the facts adduced at trial "clearly demonstrate[d] that whatever this clause in the subcontract was intended to mean, it is not what occurred between the parties while operating on the job site" and the subcontractor in actuality worked under the direction of the general contractor. *Id.*

Here, the fact that Wickersham initially accepted some late payments does not show a mutual consent to modify the payment provision as to all future payments. And, unlike in *Kline*, Wickersham did object to the late payments during the course of the project, even suspending work because of them. Therefore, the court does not find that the evidence "clearly demonstrate[s] that whatever this clause in the []contract was intended to mean, it is not what occurred between the parties while operating on the job site." In fact, viewing Wickersham's actions while operating on the job site as a whole, it is clear that Wickersham did not waive the payment provisions, as starting in June 2015 it discussed delayed payments, and starting in September 2015 it suspended work and demanded interest.

Sudlersville also argues it was excused from timely paying Wickersham because of frustration of purpose. It points to *Baltimore Luggage Co. v. Ligon*, 208 Md. 406 (1955), in which the court found that a contractor was excused from performance, under the doctrine of impossibility of performance, when the contractor would have to trespass on another's property to fulfill the contract. *Id.* at 417–18. "The principle underlying the frustration of purpose doctrine is that where the purpose of a contract is completely frustrated and rendered impossible

15

of performance by a supervening event or circumstance, the contract will be discharged."

*Harford Cty. v. Town of Bel Air*, 348 Md. 363, 384 (1998) (internal quotations and citation

omitted).

There is no contention here, as there was in *Ligon*, that Sudlersville could not timely pay

Wickersham without committing an illegal act.  Sudlersville argues it is excused because it could

not have foreseen that payment sources would not approve the funding in time and because it did

not cause the delay in approval.  But it is clear that Sudlersville knew it could not afford the

project on its own and would have to rely on payments from USDA and MDE to pay

Wickersham.  Therefore, the possibility of a delay in agency approval was a reasonably

foreseeable circumstance.  Further, even if it was not Sudlersville's fault that it did not timely

receive agency funding, not having the money to pay Wickersham does not constitute

impossibility of performance.  *See Stone v. Stone*, 34 Md. App. 509, 516 (1977) ("Mr. Stone's

financial inability to settle according to the contract terms is insufficient to bring into operation

the doctrine of impossibility of performance.").

### B.  Suspension

General Condition 15.04.B provides that "if Engineer has failed to act on an Application

for Payment within 30 days after it is submitted, or Owner has failed for 30 days to pay

Contractor any sum finally determined to be due, Contractor may, seven days after written notice

to Owner and Engineer, stop the Work until payment is made of all such amounts due

Contractor, including interest thereon."  There appears to be no dispute that Wickersham was

within its rights to suspend work initially.  (J.X. 7 ("Based on the delay in payment for Pay

Applications 9 & 10, Wickersham was within its rights to stop the Work[.]"); Testimony of

String, stating that Wickersham had cause to suspend work).  Sudlersville argues that by

November 6, 2015, however, all payments due were current, so the suspension was no longer

authorized.  Wickersham argues that because Sudlersville had not paid interest, under General

Condition 15.04.B it was within its rights to continue the suspension.

The contract does not contain a provision providing for interest or specifying the rate of

interest.  As Sudlersville points out, a provision on interest[15] that would normally be in the

EJCDC form contract[16] was omitted from this contract, with the language "not used."  (Form of

Agreement, Art. 7).  Because this provision was removed, Sudlersville argues that the contract

does not require any interest payments, including on pay applications 9–11.  But the court does

not find that removal of Article 7 demonstrates that interest is not payable under the contract.

First, it is not clear why the interest provision was removed.  (*See* Testimony of String, stating

that clearly Article 7 was intentionally deleted but not stating why).  There is no indication it was

removed because of an agreement that interest would not be due under the contract.  Second, the

Form of Agreement simply states "Article 7 – not used" and it is not clear from the face of the

contract that Article 7 is an interest provision.  The plain meaning of this is that Article 7 was not

used, but not that no interest is payable under the contract.

Additionally, it appears that interest was standard in these types of contracts.  The

original draft of the wastewater treatment contract generated by RETTEW Engineering, which

was Sudlersville's engineering firm before it hired KCI, included a five percent interest rate.

(Testimony of String).  In other similar contracts that KCI generated, the interest rate was one

percent or two percent.  (*Id.*).

---

[15] The article normally provides that interest will be paid at a rate of __ percent per annum, with the blank to be filled in by the parties.  (Testimony of String).

[16] USDA required the use of these Engineers Joint Contract Document Committee form contracts for this project. (Testimony of String).  The preferred method of modifying the form of agreement and general conditions is to do so through the supplementary conditions; however, it appears that in certain instances, for example the interest provision, modifications were made to the form of agreement and general conditions directly.  (*See id.*).

Further, Sudlersville and KCI admitted that some interest was due to Wickersham for late payments.  In a December 18, 2015, email, String advised Manning and Peter Bourne to establish the date the payment applications were paid as that "should stop the clock on any interest payments," (P.X. 8), demonstrating String's belief that interest was due.  Also, String was informed by email on March 8, 2016, that there was no interest provision in the contract and was asked whether this meant there would be no interest, or interest by default, to which he replied that there would be interest by default.  (Testimony of String; P.X. 9 (March 8, 2016, email between A. Tilghman and D. String)).  And an April 27, 2017, email from Manning stated that she tried to explain to Sudlersville commissioners that "we do owe interest" to Wickersham. (P.X. 15).

In sum, General Condition 15.04.B provides that Wickersham may stop work until outstanding payments, including interest thereon, are paid.  The plain meaning of this is that Wickersham was entitled to suspend work until it was paid interest on the late payments.  But even if this provision is ambiguous, the court considers the general practice and Sudlersville's and KCI's admissions, which all indicate that interest was due to Wickersham for the late payments.  Therefore, Wickersham was within its rights to continue the suspension until interest was paid.[17]

The court notes that Wickersham also conditioned its return to work on KCI responding to certain RFIs and PCOs, among other demands.  (*See* J.X. 5, October 16, 2015, letter).  General Condition 15.04.B allows for suspension because of late payments, and General Condition 6.18 provides that "No Work shall be delayed or postponed pending resolution of any disputes or

---

[17] The contract does not provide a rate of interest.  As the court explains below, in the absence of a provision stating the rate of interest, the court will use the legal rate of 6 percent per annum.  While the town may reasonably have challenged Wickersham's demand for 12 percent or more in interest, (*see* Testimony of Berg), it was not entitled to pay no interest at all.

disagreements, except as permitted by Paragraph 15.04 or as the Owner and Contractor may

otherwise agree in writing."  Therefore, disputes related to failure to respond to RFIs and PCOs

and other non-payment related issues were not permissible reasons for suspending work.  But

while this was improper, Wickersham was within its rights to continue the suspension due to

unpaid interest, regardless of the additional reasons it gave for the suspension.

   C.   Completion Delays

   Frank Versaw testified on behalf of Wickersham as an expert on issues related to

scheduling and cost claims, and also submitted an expert report.  The court found him qualified

to give opinion testimony in the field of construction schedules, construction claims, and costs.

Versaw performed a time impact analysis of the project in order to determine which delays in the

project were attributable to Wickersham and which were attributable to Sudlersville.  (Testimony

of Frank Versaw).  A time impact analysis is conducted by starting with a baseline schedule

(here, Wickersham's plan for construction), and building it incrementally based on what actually

happened in order to determine how the schedule changed on a month-to-month basis; based on

this analysis, delay is then allocated between the parties.  (*Id.*).  To determine how the project

actually progressed, Versaw consulted Wickersham project supervisor Jim Moffett's daily

reports.  (*Id.*).  After identifying the reasons for the delays, Versaw then reviewed the contract to

determine whether the delays identified were compensable for Wickersham (e.g. whether they

were because of weather, which would be noncompensable, or attributable to Sudlersville or

KCI).  (*Id.*).  Versaw worked with Sudlersville CFO Bruce Berg to calculate interest, and Smith

to calculate direct costs, in order to determine the costs to Wickersham of the delays attributable

to Sudlersville.  (*Id.*).

   Versaw found that Wickersham had a reasonable plan to complete the work at the start of

the project.  (*Id.*).  In general, the delays attributable to Sudlersville were caused by the

suspension and deficient design documents.  (*Id.*; P.X. 97, Expert Report at 5).  In total, Versaw

found that Sudlersville was responsible for 322 days of delay, and Wickersham was responsible

for thirty-six.  (Expert Report at 5; Testimony of Versaw).  The delays for which Versaw found

Wickersham responsible all occurred in the beginning period of the project, before the

suspension.  (Expert Report at 25 (August 2015 Update, showing Wickersham responsible for 36

delay days)).[18]  Of the 322 days for which Versaw found Sudlersville responsible, 165 were

during the suspension, and 157 were after the suspension.  (Testimony of Versaw; Expert Report

at 5).

The court credits Versaw's testimony and report in part.  Versaw adequately explained

his time impact analysis, he is qualified to perform such an analysis, and Sudlersville did not

present any competing expert testimony.  But there are some deficiencies in Versaw's analysis

which prevent the court from accepting his findings in full.  First, Versaw relied only on the

daily reports of Moffett, but did not review the reports of KCI's representative, Jessie Downey,

in determining the actual construction progress, in order to allocate delays.  (Testimony of

Versaw).  Doing so might have presented a more complete picture of the construction timeline

and reasons for delay.  Second, the court credits String's testimony that some of the design

problems presented in the RFIs and change orders were already identified and responded to in

December 2014, and therefore should not have delayed the schedule.  (Testimony of String).

The court also credits String's testimony that some of the delays were caused by Wickersham's

substitution of products and the coordination required between disciplines because of that.  (*Id.*)

While Wickersham was allowed to substitute products, delays relating to coordination because of

that substitution should not be attributable to Sudlersville.

---

[18] Weather delays also were attributed to Wickersham for the purpose of the analysis because they are
noncompensable.  (Testimony of Versaw).

In light of String's testimony, and Versaw's failure to consider Downey's reports, the court finds that only fifty percent of the completion delay days identified by Versaw are attributable to Sudlersville.  The court agrees, however, that all of the suspension delay days are attributable to Sudlersville.  In sum, 165 days of suspension delay are attributable to Sudlersville, and 78.5 completion delay days are attributable to Sudlersville.[19]

### D.  Payment Applications 19 and 20

Payment applications 19 and 20 were submitted to KCI for approval, but it appears they were never provided to Sudlersville or USDA for signature and approval.  There was a dispute with regard to these applications as to the amount of retainage Sudlersville was entitled to keep.  As to application 19, the dispute about retainage appears to have been resolved on August 19, 2016, when String indicated the retainage amount was acceptable, (P.X. 134), so it is not clear why this application has not been presented to Sudlersville and, if approved by Sudlersville and USDA, why the amount owed has not been paid to Wickersham.[20]  Assuming the maximum amount of time to present the application to the owner, and then the maximum amount of time to pay, the payment was due on September 8, 2016.[21]

As to application 20, there is a dispute about retainage, so KCI would not recommend the application for approval.  It does not appear this dispute was resolved, and the application has not been approved or paid.

[19] General Condition 12.03.B provides that delays due to the engineer or the owner entitle the contractor to an equitable adjustment in contract price.  Therefore, for the purposes of assessing damages, it does not matter whether Sudlersville or KCI was responsible for the delay.
[20] Ronald Ford, Sudlersville town commissioner, testified that the town did not approve pay application 19 because of deficiencies in Wickersham's construction.  (Testimony of Ford).  It appears this may relate to the dispute over retainage, as retainage is meant to ensure that work is properly completed.  This appears to have been resolved, though, when Wickersham agreed to KCI's position on retainage.
[21] To the extent that KCI has not yet presented pay application 19 to Sudlersville, Sudlersville cannot use this as an excuse not to pay Wickersham.  It appears Sudlersville has made no effort to determine why KCI has not presented the pay application, has not otherwise communicated with KCI about the pay application, and has not made reasonable efforts to fulfill its obligation to review the pay application.

21

### III.   DAMAGES

"In Maryland, a party suffering a breach of contract is entitled to recover as damages the amount that would place him in the position he would have been in had the contract not been broken."  *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 506 (4th Cir. 1986) (footnote omitted).  "[U]pon breach of contract, the non-breaching party is entitled to compensatory damages which are the natural and proximate consequence of the breach, or which are reasonably within the parties' contemplation at the time of contracting."  *Munday v. Waste Mgmt. of N. Am., Inc.*, 997 F. Supp. 681, 685 (D. Md. 1998).  Damages must be "proved with reasonable certainty, and may not be based on speculation or conjecture."  *Asibem Assocs., Ltd. v. Rill*, 264 Md. 272, 276 (1972).

#### A.  Suspension and Completion Damages

The court will address these damages together.  Wickersham requests $212,998.90 in suspension damages and $346,398.16 in completion damages, based on Versaw's expert report and opinion.  (Expert Report at 44).  Sudlersville challenges Wickersham's claim for suspension damages for costs to off-site employees, overhead, and equipment expenses for equipment it owns.

General Condition 15.04.B, regarding the right of the contractor to suspend work, states that it does not "preclude Contractor from making a Claim under Paragraph 10.05 for an adjustment in Contract Price or Contract Times or otherwise for expenses or damage directly attributable to Contractor's stopping the Work as permitted by this Paragraph."  General Condition 12.03.B provides that if the owner or engineer "delays, disrupts, or interferes with the performance or progress of the Work, then Contractor shall be entitled to an equitable adjustment in the Contract Price or the Contract Times, or both."  Contract Price is defined as "[t]he moneys

payable by Owner to Contractor for completion of the Work in accordance with the Contract

Documents as stated in the Agreement[.]"  (General Condition 1.01.A.13).

In arguing that certain costs are excluded, Sudlersville points to the "Cost of Work"

provision, which states that the "Cost of Work" excludes "[p]ayroll costs and other compensation

of Contractor's officers, executives . . . and other personnel employed by Contractor, whether at

the Site or in Contractor's principal or branch office for general administration of the Work and

not specifically included in the agreed upon schedule of job classifications"; "[a]ny part of

Contractor's capital expenses, including interest on Contractor's capital employed for the Work";

and "[o]ther overhead or general expense costs" not otherwise specifically included.  (General

Condition 11.01.B.1, B.3, B.5).  But this only concerns the "Cost of Work" Wickersham is owed.

The contract also provides for an overall "Contract Price" which is broader, as it includes the

"Contractor's Fee," meant to cover overhead, profit, and other administrative costs to

Wickersham.  (General Condition 12.01.C; 11.01.B.1 (payroll costs for performing general

administration considered administrative costs covered by the contractor's fee)).  According to

the contract, the contractor's fee is a mutually acceptable fixed fee or a percentage of the work

performed.  (General Condition 12.01.C).

i.   Contractor's Fee for Overhead and Profit

Wickersham has calculated the contractor's fee for overhead and profit based on General

Condition 12.01.C.2.  How the fee is determined is based on the nature of the cost of work:

fifteen percent for payroll costs and costs of materials, equipment, transportation and storage,

and five percent for payment to subcontractors.  *Id.*  Although the section does not divide

between profit and overhead, Wickersham appears to have allocated ten percent to overhead and

five percent to profit, charging both on the extra costs due to completion delays, but only

overhead (ten percent) on the extra costs due to suspension.  This seems to be a fair allocation,

and Sudlersville does not object except for arguing that overhead and payroll costs are not allowed.

ii. Underabsorbed Overhead

Wickersham also requests "underabsorbed overhead" for the suspension and completion delays. Wickersham requests overhead in the amount of $94,116 for the 165 days of the suspension, and $89,553 for the 157 delay days it argues are attributable to Sudlersville. (ECF 114-3, 114-4). Wickersham proposes the court use the *Eichleay* formula for calculating the amount of underabsorbed overhead due.

"The *Eichleay* formula is used to determine a government contractor's damages reflecting unabsorbed home office overhead when the government delays work on the contract indefinitely but requires the contractor to remain available to resume work immediately on the government's instruction." *Satellite Elec. Co. v. Dalton*, 105 F.3d 1418, 1419 (Fed. Cir. 1997). "The three elements necessary to recover *Eichleay* damages are: (1) a government-imposed delay occurred; (2) the government required the contractor to 'stand by' during the delay; and (3) while 'standing by,' the contractor was unable to take on additional work." *Id.* at 1421 (citation omitted). The contractor must show that it was unable to take on other work, and once it does, the burden of production shifts to the government to present rebuttal evidence that the contractor could have taken on other work during the delay. *Id.* at 1421–22. "The *Eichleay* formula compensates contractors who are unable to take on replacement work because the standby status prevents the contractor from doing so." *Id.* at 1421. It involves "an allocation of the total recorded main office expense to the contract in the ratio of contract billings to total billings for the period of performance. The resulting determination of a contract allocation is divided into a daily rate, which is multiplied by the number of days of delay to arrive at the amount of the claim." *Id.* at

24

1420 (quoting *Eichleay Corp.*, A.S.B.C.A. No. 5183, 60–2 B.C.A. (CCH) ¶ 2688, 1960 WL 538 (July 29, 1960)).

The contract does not provide for overhead except as a percentage of the work performed (the "contractor's fee," discussed above).  General Condition 12.03.B, however, provides for an "equitable adjustment" in the contract price if the owner causes delay.  That overhead is not included in the "cost of work" does not mean the court cannot consider it when making an equitable adjustment to the "contract price," which is broader than the "cost of work."

The court, however, does not find it is equitable to include underabsorbed overhead in addition to what is provided for in the contract.  Here, Wickersham presents the costs of the delay, which includes payroll costs and equipment expenses.  The contract provides that the contractor's fee, which includes overhead costs, is calculated as a percentage of the cost of work.  As discussed above, the court finds Wickersham is entitled to the contractor's fee as a percentage of the extra cost due to the delay.  But awarding additional overhead costs pursuant to the *Eichleay* formula would compensate Wickersham for overhead in addition to the contractor's fee that was agreed upon in the contract.  Therefore, the court will deny Wickersham's request for underabsorbed overhead.

Further, even using *Eichleay* as a guide for what is equitable for Wickersham, Wickersham has not met the required prongs to be entitled to *Eichleay* overhead damages.  First, as to the suspension, while Wickersham was within its rights to suspend the contract, the court cannot find that the suspension was a Sudlersville-imposed delay.  Sudlersville did not require the suspension; rather, it was a right that Wickersham exercised under the contract.  If Wickersham did not wish to suspend the project until Sudlersville was current on payments, Wickersham could have terminated the project.  (General Condition 15.04.A).  Additionally, during the suspension, Wickersham's supervisor Jim Moffett performed other jobs.  (Testimony

of String).  Although Moffett was unable to take on a supervisory position of a large contract, so

his work during suspension may not have returned as much revenue to Wickersham,

Wickersham makes no attempt to account for the revenue that Moffett was able to bring in

during the suspension.

Finally, as to delays during the completion period, Wickersham has not presented any

evidence of any jobs that it could not take because the Sudlersville project took longer than

expected.  It is not equitable to award Wickersham underabsorbed overhead on the theory that it

could have taken on another job and was prevented from doing so, without any evidence that this

was the case.

### iii.  Cost to Off-Site Employees

Wickersham requests damages related to extra work performed by Smith and Berg during

the suspension.  Wickersham requests $34,923.00 for 232.82 hours of project management work

(by Smith) and $5,199.00 for 48.33 hours of controller work (by Berg).  (ECF 114-3).

Sudlersville argues the cost to off-site employees is prohibited under the contract because it is

excluded from "cost of work" but, as discussed above, its exclusion from the cost of the work

does not prevent the court from considering it when determining an equitable adjustment to the

contract price.[22]

The court will not award these costs for extra work performed by Smith and Berg,

however, because it is not clear what this work entailed.  Relevant here, General Condition

15.04.B provides that the contractor, if it chooses to suspend, is not precluded from making a

claim "for expenses or damage directly attributable to Contractor's stopping the Work as

---

[22] Wickersham also requests compensation for work performed by supervisor Moffett related to the suspension, for 201 hours, which does not appear to be off-site work, or challenged by Sudlersville.  Because this appears to be for hours actually worked by Moffett (and not for hours Moffett was simply held over on this job during the suspension), it would not be affected by the fact that Moffett was able to perform work on other projects during the suspension period.

permitted by this Paragraph."  The record shows that during the suspension Smith and Berg may have performed work related to other disputes with Sudlersville and KCI, including the delay in responding to RFIs, that under 15.04.B could not form the basis of the suspension and would not be "directly attributable to Contractor's stopping the Work as permitted" by 15.04.B.  Therefore, the court does not have enough information to award labor costs for time spent by Smith and Berg during the suspension.

Additionally, to the extent that the extra work performed by Smith and Berg was for general administration, this is part of the contractor's fee which the court will award to Wickersham.  (General Condition 11.01.B.1. (payroll costs to officers and executives for general administration are considered administrative costs covered by the contractor's fee)).  This is also true as to the $24,318 for "Project Management" Wickersham requests for completion delays. (ECF 114-4).  Although it is not clear exactly what this refers to, it appears that this also is for extra work performed by Smith, which if for general administration would be included in the contractor's fee.[23]

iv. Equipment Expenses

Wickersham requests damages for having three pieces of its equipment on standby during the delays.  Sudersville argues that these costs are excluded under the cost of work but, again, this does not prevent the court from awarding these expenses to Wickersham as part of an equitable adjustment to the contract price.

---

[23] Wickersham requests $49,522 in labor costs for Moffett due to the completion delay (for 697.5 hours).  (ECF 114-4).  This is a change from what was presented at trial, as the trial exhibit presenting delay damages inadvertently combined the costs requested for Moffett with the costs requested for project management.  During the trial, the court questioned Versaw about whether these labor costs for Moffett were reflected anywhere else, and Versaw stated he was not aware that they were.  (Testimony of Versaw).  Sudlersville has provided nothing to contradict that, and does not seem to challenge this cost specifically, as it challenges only labor costs for off-site employees.

Versaw calculated the stand-by cost of Wickersham's equipment on the job site by using Wickersham's rental rates for the equipment.  (Testimony of Versaw; ECF 114-3 and 114-4, items "JCB," "Hoe," and "ASV").  Versaw considered using the Army Corp of Engineer equipment rental rates, but found that Wickersham's were, in general, lower. (Testimony of Versaw).[24]  In making an equitable adjustment, the court finds it fair to compensate Wickersham for the delay time, attributable to Sudlersville, in which it could not use its equipment.  Further, its calculations, based on its rental rates, is fair, and Sudlersville has not specifically challenged those calculations except to argue that the contract does not allow for these types of damages.

v. Suspension Damages

In sum, the court will award the following with regard to suspension:

- $22,910 in material costs, with ten percent mark-up overhead ($2,291) (*see* P.X. 107);[25]

- $30,137.4 in labor costs (*see* P.X. 107, minus costs for project management and controller), with ten percent mark-up overhead ($3,013.74);

- $9,800 subcontract cost (P.X. 107);

- $228 equipment cost (P.X. 107);

- $4,927 in other costs, with $493 mark-up overhead (P.X. 107); and

- $1,177 for bond/insurance (P.X. 107).

**TOTAL = $ 74,977.14**

vi. Completion Damages

---

[24] Because the court finds that the contract allows Wickersham to recover overhead costs and other delay damages, and that there is no provision in the contract that prohibits delay damages, the court does not address Wickersham's alternate argument that should such a clause exist, it is unenforceable due to Sudlersville's alleged intentional interference with the contract.

[25] The costs are also presented in ECF 114-3, but not separated based on type of cost (materials, labor, subcontract, and equipment).

Because the court finds Sudlersville responsible for only fifty percent of the delay days identified by Wickersham (i.e. 78.5 days), the court will reduce certain of Wickersham's requested costs that appear to have been calculated based on the length of the delay. First, the court notes that it is not clear how Wickersham arrived at some of its calculations. For example, Wickersham in its chart for completion delay damages requests $73,840 in labor costs for supervision based on 1,040 hours. (P.X. 108). In its post-trial brief, Wickersham explained this was supposed to be broken up into two items: project management, and supervision, with costs for supervision totaling $49,522 for 697.5 hours of work. (ECF 114-4). It is not clear how Wickersham arrived at 697.5 hours. Similarly, its standby costs for its equipment (JCB, Hoe, ASV) is based on 880 hours, (P.X. 108), but it is also not clear how Wickersham obtained this number, and how it relates to the asserted delay of 157 days. It seems, however, that these costs were calculated with respect to the delay days. (*See* Testimony of Versaw, noting damages related to fact superintendent had to stay on the job, even if job was delayed); ECF 114-4 (referring to equipment costs as "idle cost" and noting that they are allowable damages for delay)). Moreover, the calculations have not been specifically challenged by Sudlersville, and the court agrees that, for delay days attributable to Sudlersville, Wickersham is entitled to damages related to having to keep Moffett on the project[26] and the equipment on-site.

Therefore, the court will divide in half the costs for Moffett's supervision and the equipment, in accordance with its finding that Sudlersville is responsible for 78.5 of the completion delay days. The court will award $24,761 in labor costs for supervision, and $22,387 in equipment costs. For the reasons explained above, the court will not award project

---

[26] Again, Versaw informed the court that he did not believe these labor costs for Moffett were reflected anywhere else in the contract price. Sudlersville has not contradicted that. The court notes that while it appears Moffett performed work on other projects during the suspension, it does not appear that he did so during the completion period, after Wickersham had remobilized.

management and overhead expenses, and will award all the other requested costs that
Sudlersville has not specifically challenged.

In sum, the court will award the following with regard to completion damages:

- $61,321 in material costs (*See* P.X. 108,[27] and subtracting half of the equipment
  costs), with ten percent mark-up overhead ($6,132) and five percent mark-up profit
  ($3,066.05) (P.X. 108);

- $62,923 in labor costs (*See* P.X. 108, and subtracting project management and half of
  supervisions costs), with ten percent mark-up overhead ($6,292.30) and five percent
  mark-up profit ($3146.15);

- $27,843 in subcontractor costs (*See* P.X. 108), with five percent mark-up profit
  ($1,392); and

- $2,543 for bond/insurance.

**TOTAL= $174,658.50**

B.  Unpaid Contract Value

According to Versaw, there is $113,075.53 in contract value that Wickersham has not yet
been paid.  (Testimony of Versaw; *see* Expert Report at 42 (subtracting total paid to date of
$6,223,943.47 from the confirmed contract value, including change orders 1–11, of
$6,337,019)).  It appears this includes the $68,031 already approved by KCI—but not paid—in
pay application 19.  The court heard conflicting testimony at trial regarding the value of
unfinished work.  String testified that after substantial completion, over $25,000 worth of work
remained.  (Testimony of String).  Smith testified that the outstanding work in the later generated
punchlist, on July 18, 2017, was valued at about $1,000 dollars.  (Testimony of Smith).

---

[27] Costs are also presented in ECF 114-4.

According to Jo Manning, there are still outstanding items as to the project, and Sudlersville spent approximately $132,000 to repair work that Wickersham did.  (Testimony of Manning).

The project has reached at least substantial completion (ECF 100 at 18, Joint Stipulations), and a final completion acceptance inspection was performed on September 7, 2016 (J.X. 9), but KCI has never approved the final completion of the project (Testimony of Smith). On October 3, 2016, Dan String emailed Angela Tilghman of USDA that the "contractor has completed 99% of all work" and that the biological process of the treatment plant continues to struggle but "[t]his is through no fault of the contractor."  (J.X. 8).  Here, the court finds that there may have been some work outstanding and some work that needed to be repaired. Sudlersville, however, has provided nothing to substantiate or explain its claim that it had to spend approximately $132,000 to correct Wickersham's work.  Further, it is not clear what items remain outstanding, and Sudlersville has not made an attempt to quantify the value of the outstanding items, except for String's testimony that, for the purposes of retainage, it was more than $50,000 (200 percent of the value of the outstanding work).  This does not appear to take into account, however, that some items were resolved by July 18, 2017.  (J.X. 22).  Finally, although there may be outstanding warranties that Wickersham has not provided Sudlersville, Sudlersville similarly has not quantified their value.  Therefore, given the lack of evidence regarding the cost of the outstanding work, and the fact that Wickersham would otherwise be entitled to the full contract price, the court will award Wickersham the unpaid contract value, which is $113,075.53.

### C.  Change Order 12

Change Order 12, resolving PCOs 17, 18, and 19, is for $11,492, has been agreed upon by the parties, but has not been paid yet.  (Testimony of Versaw; P.X. 115, Change Order No. 12).  Given that Change Order 12 has been approved, the court will award Wickersham $11,492.

D.  Interest

"Pre-judgment interest is allowable as a matter of right when 'the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date.'"  *Buxton v. Buxton*, 363 Md. 634, 656 (2001) (citation omitted).  "On the other hand, in tort cases where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement, the award itself is presumed to be comprehensive, and pre-judgment interest is not allowed."  *Id.* "Between these poles of allowance as of right and absolute non-allowance is a broad category of contract cases in which the allowance of pre-judgment interest is within the discretion of the trier of fact."  *Id.* at 657.  When the parties have agreed on a rate of interest, that agreement should be honored.  *Noyes Air Conditioning Contractors, Inc. v. Wilson Towers Ltd. P'ship*, 122 Md. App. 283, 293 (1998).  Otherwise, prejudgment interest should "be calculated at the legal rate of six percent per annum."  *Harford Cty. v. Saks Fifth Ave. Distribution Co.*, 399 Md. 73, 96 (2007) (citing Md. Const. Art. III, § 57); *see Maryland Nat'l Bank v. Cummins,* 322 Md. 570, 600 (1991) ("Absent a contractual stipulation or a statute, the rate of prejudgment interest may not exceed the general legal rate of six percent.").

As discussed above, the contract here does not mention interest, except in the suspension provision, which states that the contractor may stop work "until payment is made . . . including interest thereon."  (General Condition 15.04.B)  Prejudgment interest is a matter of right when "the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment."  *Buxton*, 363 Md. at 656 (citation omitted).  And as explained above, the court does not find that the removal of Article 7 shows that no interest is payable under the contract.

32

Here, interest is due on progress payments 9–19 (as Wickersham waived any breaches as to the first eight).  These were fixed sums, not contested by Sudlersville, that became due at a date certain.  The contract does not provide a rate of interest.  As noted above, String testified that the original version of the wastewater treatment contract generated by RETTEW included an interest rate of five percent, and other similar contracts KCI had generated had interest rates of one percent or two percent.  (Testimony of String).   Manning testified that the rate of interest on the loans Sudlersville took out to fund the project was 2.125 percent, (Testimony of Manning), and Berg testified that a 12.25 percent interest rate reflected Wickersham's cost of capital, (Testimony of Berg).  In the absence of an express provision in the contract providing a different rate of interest, however, interest is due at the general legal rate of six percent per annum.[28]

Wickersham also requests interest on its suspension and completion damages.  The court finds that Wickersham is not entitled to prejudgment interest as these damages were "unliquidated or not reasonably ascertainable" prior to the court's judgment.  *Baltimore Cty., Maryland v. Aecom Servs., Inc.*, 200 Md. App. 380, 430 (2011).  In point of fact, the court has not awarded Wickersham everything it asked for, disagreeing that it is entitled to costs such as underabsorbed overhead.  The damages Wickersham claimed were subject to reasonable dispute (both in terms of liability and the amount of damages) prior to judgment, and were not certain, definite, and liquidated, so as to support an award of prejudgment interest.  This is also true as to the unpaid contract value, except for pay application 19, which was agreed to by KCI.  As to the unpaid contract value, although the court awards Wickersham the full value, there were

---

[28] It is not clear if Wickersham requests interest for Change Order 12.  Although Change Order 12 was approved, it is not clear if it was ever included in an approved pay application, so that the amount would be due.  Therefore, the court does not award interest on Change Order 12.

reasonable disputes over uncompleted work such that the value was not certain, definite, and liquidated prior to judgment.

E.   Attorneys' Fees

Wickersham argues that it is entitled to attorneys' fees under General Condition 15.04.B, which allows for "for expenses or damage directly attributable to Contractor's stopping the work as permitted by this Paragraph" or 11.01.A.4, which includes in the cost of work "[c]osts of special consultants (including but not limited to Engineers, architects, testing laboratories, surveyors, attorneys, and accountants) employed for services specifically related to the Work." Additionally, General Condition 15.04.A, providing for termination, allows payment on the same terms as paragraph 15.03, and General Condition 15.03.A.3 allows for "all claims, costs, losses, and damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs) incurred in settlement of terminated contracts with Subcontractors, Suppliers, and others[.]"

Maryland law generally provides that when allocating the costs of litigation, "each party bears its own costs, including attorneys' fees, regardless of the outcome" unless an exception applies. *Ocean City, Md., Chamber of Commerce, Inc. v. Barufaldi*, 434 Md. 381, 384 (2013). An exception is when the contract provides for attorneys' fees. *Id.* at 384 n.3; *see NOVA Research*, 405 Md. at 445.

The contract here does not provide for attorneys' fees in a breach of contract action. First, the plain and ordinary meaning of "expenses or damages directly attributable to Contractor's stopping the Work" (in General Condition 15.04.B) does not include attorneys' fees for a breach of contract action. "Directly attributable" indicates that the expense or damage must be closely caused by the suspension. This breach of contract action may be a result of the actions that led to the suspension (the late payments), or to recover for damages sustained in the

suspension, but it is not such an immediate result of the suspension as to be "directly attributable."  Neither does General Condition 11.01.A.4 provide for attorneys' fees.  That provision states that the cost of work includes special consultants, such as attorneys, "employed for services specifically related to the Work."  "Work" is defined as "[t]he entire construction or the various separately identifiable parts thereof required to be provided under the Contract Documents." (General Condition 1.01.51).  This breach of contract action is not "Work" and therefore attorneys' fees related to the action are not "specifically related to the Work."  Finally, General Condition 15.03.A.3 provides for attorneys' fees incurred in settlements of terminated contracts with suppliers or subcontractors, but that has not been alleged here.  Accordingly, no attorneys' or expert consulting fees will be awarded.

## IV.    CONCLUSION

For the reasons stated above, the court finds that Sudlersville has breached the contract with respect to late payments, and that Wickersham is entitled to an equitable adjustment in contract price due to the delay caused by Sudlersville.  The court will award Wickersham damages in the following amounts, for a total of $402,000.22.

| Category | Debit | Credit |
|---|---|---|
| Suspension Damages | $74,977.14 | |
| Completion Damages | $174,658.50 | |
| Interest on Late Payments | $34,100.74 | |
| Change Order 12 | $11,492.00 | |
| Unpaid Contract Value | $113,075.53 | |
| Overpayment | | ($6,303.69) |
| *Gross Debits & Credits* | *$408,303.91* | *($6,303.69)* |
| **Total Damages** | $408,303.91 - $6,303.69 = **$402,000.22** | |

A separate Order entering judgment follows.


_____9/22/20_____                              _____/S/_____
Date                                           Catherine C. Blake
                                               United States District Judge


## Appendix A – Interest Calculations

| Pay application number | Invoice Date | Amount Due | Engineer Approval | Owner Approval | USDA Approval | Due Date | Date Paid | Days Late | Interest |
|---|---|---|---|---|---|---|---|---|---|
| 9 (P.X. 59, 60, 88) | 07/6/15 | $521,585.08 | 7/14/15 | 7/15/15 | 9/8/15 | 7/24/15 | 10/1/15 | 69 | $5,916.06 |
| 10 (P.X. 61, 62, 89) | 08/3/15 | $665,801.20 | 8/3/15 | 8/3/15 | 9/8/15 | 8/13/15 | 10/1/15 ($327,590.89, P.X. 62, WICK 029025) | 49 | $2,638.68 |
| | | | | | | | 10/8/15 ($126,605.00) | 56 | $1,165.46 |
| | | | | | | | 10/9/15 ($211,605.31, P.X. 63, WICK 029501) | 57 | $1,982.71 |
| 11 (P.X. 63, 64, 90) | 09/2/15 | $418,488.21 | 9/14/15 | 9/14/15 | 9/16/15 | 9/22/15 (max 20 days) | 10/9/15 ($6,303.69, P.X. 63, WICK 029501) | 17 | $17.62 |
| | | | | | | | 11/6/15 ($412,184.52) | 45 | $3,049.04 |
| 12 (P.X. 65, 66, 91) | 10/02/15 | $226,834.12 | 10/5/15 | 10/5/15 | 10/19/15 | 10/15/15 | 11/6/15 | 22 | $820.33 |
| 13 (P.X. 67, 68, 92) | 11/2/15 | $15,934.11 | 12/22/15 | 12/22/15 | 12/22/15 | 11/22/15 (max 20 days) | 11/6/15 ($6,303.69, P.X. 67, WICK 029536, 029561) | | (on $9,630.42 outstanding, given overpayment of $6,303.69) |
| | | | | | | | 12/31/15 ($15,934.11, P.X. 68, | 39 | $61.74 |

| | | | | | | | WICK 029061) | | |
|---|---|---|---|---|---|---|---|---|---|
| 14 (P.X. 69, 70, 93) | 4/4/16 | $204,410.55 | 4/14/16 | 4/19/16 | 4/26/16 | 4/24/16 (max 20 days) | 5/6/16 | 12 | (on $198,106.86, given overpayment of $6,303.69) $390.79 |
| 15 (P.X. 71, 72, 94) | 4/29/16 | $167,478.35 | 5/13/16 | 5/23/16 | 5/26/16 | 5/19/16 (max 20 days) | 7/1/16 | 43 | (on $161,174.66, given overpayment of $6,303.69) $1,139.26 |
| 16 (P.X. 73, 74, 95) | 6/6/16 (handwritten change of date, P.X. 95, USDA 000 754) | $7,932.50 | 6/7/16 | 6/7/16 | 6/16/16 | 6/17/16 | 7/1/16 | 14 | (on $1628.81, given overpayment of $6,303.69) $3.75 |
| 17 (P.X. 75, 76, 96) | 6/6/16 (handwritten change of date, P.X. 96, USDA 000 747) | $157,501.65 | 6/7/16 | 6/7/16 | 6/16/16 | 6/17/16 | 7/1/16 | 14 | (on $151,197.96, given overpayment of $6,303.69) $347.96 |
| 18 (P.X. 77) | 7/7/16 | $75,071.65 | | | | 7/27/16 | 12/12/16 | 138 | (on $68,767.96, given overpayment of $6,303.69) $1,560.00 |
| 19 (P.X. 78) | | $68,031 | 08/19/16 (P.X. 134) | | | 08/29/16 (ten days after approval) | N/A | | (on $61,727.31, given overpayment of $6,303.69) $15,007.34 (as of September 16, 2020) |